UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

BRANDEN RICHTER,

      Plaintiff,

v.                                         Case No. 17-C-1595

GWENDOLYN VICK,
NANCY WHITE,
CHRYSTAL MARCHANT, and
BRIAN FOSTER,

      Defendants.

---

## DECISION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

---

On November 14, 2017, Plaintiff Branden Richter, who is representing himself and is currently incarcerated at Waupun Correctional Institution (WCI), filed a complaint pursuant to 42 U.S.C. § 1983, alleging that the warden and several members of the health services staff were deliberately indifferent to his serious mental health needs in violation of his constitutional rights. Richter claimed he had a long history of depression and other mental disorders that had resulted in suicide attempts. He alleged that while incarcerated, he had been diagnosed with anxiety disorder, adjustment disorder, panic disorder, psychotic disorder, depression, and anti-social disorder, and for at least some of these conditions he had been prescribed psychotropic medications. As a result of the failure of WCI to properly staff its psychiatric services unit and the deliberate indifference of those staff members who knew of his condition, Richter claimed he was denied necessary care and treatment which led to the exacerbation of his condition and increased incidents of self-harm and suicide attempts. Based on the allegations of his complaint, Richter was allowed to proceed on

Eighth Amendment claims against (1) a nurse for deliberate indifference to his serious mental health needs, (2) supervisory personnel and the warden for the severe under-staffing of the psychiatric services unit at the institution, and (3) the warden in his official capacity for injunctive relief to remedy the severe understaffing problem.

On June 12, 2018, Defendants moved for summary judgment. ECF No. 20. Richter did not file a response to Defendants' motion for summary judgment within thirty days as required by Civil Local Rule 56(b)(2) and has not requested additional time to file a response. Nor has Richter filed a response to Defendants' reply in support of summary judgment. This means that the proposed findings of fact asserted by Defendants are deemed uncontroverted. Civil Local Rule 56(b)(4). The failure to respond alone is grounds to grant the motion. Civil L.R. 7(d) ("Failure to file a memorandum in opposition to a motion is sufficient cause for the Court to grant the motion."). For these reasons, and also because it is clear based on the undisputed facts before me that they are entitled to judgment as a matter of law, Defendants' motion for summary judgment will be granted.

## BACKGROUND

The uncontroverted facts are that Branden Richter is an inmate who is incarcerated at WCI. Defs.' Proposed Findings of Fact (DPFOF), ECF No. 22, at ¶ 1. Defendant Brian Foster is the Warden of WCI. Defendant Gwedolyn Vick is a Nurse Clinician at WCI. Defendant Chrystal Marchant has served as the Health Services Manager at WCI since December 11, 2016. Defendant Nancy White was the former acting Health Services Manager at WCI until May 2017. Non-defendant Dr. Kevin Kallas is the Mental Health Director within the Bureau of Health Services.

**A. Psychiatry Staff Size and Prison Population**

The Wisconsin Department of Corrections (DOC) is responsible for providing mental health care through its psychological services unit (PSU) and health services unit (HSU) to the individuals

2

incarcerated at WCI. Dr. Kallas is responsible for the oversight of mental health care within the DOC, including the hiring and staffing of psychiatrists. Foster, White, and Marchant are not responsible for the hiring, staffing, or training of physicians or other psychiatric providers at WCI. *Id*. at ¶¶ 8–10.

When an inmate wants to request medical or psychiatric care, he must submit a health services request (HSR) to HSU, where it is triaged daily by a nurse who decides whether the need is urgent or not. *Id*. at ¶¶ 11–13, 42. During the time period relevant to Richter's claims, there was a statewide shortage of psychiatric providers, which was affecting health care providers statewide, not just the DOC. *Id*. at ¶ 15.

Currently, at WCI, there is approximately 68 hours of psychiatric provider time per week, comprised of 52 hours on site and 16 hours via telepsychiatry, which allows the psychiatrist to meet with an inmate electronically. WCI employs a combination of psychiatrists and psychiatric advanced practice nurse practitioners (APNPs), who have the full range of prescriptive authority as a psychiatrist, as both state and contract employees. Additionally, WCI was to gain another full-time contract psychiatrist in September 2018. *Id*. at ¶¶ 16–18.

Because of the state-wide shortage, inmates may be put on a wait list to see a psychiatric provider. *Id*. at ¶ 19. Consequently, inmates who submit urgent psychiatric requests are usually seen within a few days to a week and routine visits are usually scheduled within three to four weeks. *Id*. at ¶ 20. In September, the ratio of WCI inmates on psychotropic medications to every full-time employee was 200 to 1, which is lower than the DOC's statewide ratio of 270 to 1. *Id*. at ¶¶ 21–22. Additionally, the DOC is engaged in aggressive recruiting efforts in an attempt to provide more psychiatric providers statewide and eliminate shortages. *Id*. at ¶¶ 27–28.

3

The WCI PSU has a total of 12.4 full time psychology positions to service a population of 1,264 inmates. However, there are 5.05 full-time vacancies within those positions. *Id*. at ¶¶ 32. Compared to other maximum security institutions, the Green Bay Correctional Institution has 10 full time positions to service 1,084 inmates, Columbia Correctional Institution has 10 full time positions for 843 inmates, and the Wisconsin Secure Program Facility has 6 full time positions for 484 inmates. *Id*. at ¶ 34.

Each inmate receives a health screening when they arrive at WCI to determine whether the inmate has any mental health needs. During this screening, each inmate receives a classification. Inmates classified as MH-0 have no documented mental health needs. Inmates classified as MH-1 have some mental health needs but are not considered seriously mentally ill. Inmates classified as MH-2A or MH-2B have one or more psychological disorders that rise to the level of serious mental illness with the different letters indicating the type of the disorder, not the severity. *Id*. at ¶ 38. An inmate's mental health classification dictates how often PSU will interact with them. *Id*. at ¶¶ 39–40.

To ensure that inmates are receiving the psychiatric help they need despite the waitlists and shortages, a staff member will triage the complaint and presenting symptoms to determine a degree of severity. For instance, someone engaging in objectively serious self-harm will be deemed more severe than someone complaining of mild anxiety. *Id*. at ¶¶ 24–26. Additionally, a PSU clinician is always on-call. Although inmates are directed to submit a psychological services request (PSR) to receive services, they are also informed that they should alert staff about emergent or urgent situations, and PSU staff will respond to the units directly. *Id*. at ¶¶ 43–44.

If a PSU staff member determines that an inmate is a threat to himself or others, he may be removed to the restrictive housing unit (RHU) and placed on clinical observation, which is a very

4

restrictive status where the security staff check on an inmate every fifteen minutes to ensure the inmate is not attempting to harm himself. *Id*. at ¶¶ 46–47.

**B. Richter's Mental Health Treatment**

Richter has a history of drug and alcohol abuse. He also claims to have a history of depressive disorder for which he prefers to self-medicate with marijuana and cocaine. Richter began his incarceration at WCI in 2012. When he was admitted, he had a mental health code of MH-0, meaning he had no documented mental healthcare needs and did not need to be monitored by PSU. Because he had no mental health complaints when admitted, he agreed to contact PSU as needed. *Id*. at ¶¶ 50–53.

In November 2016, Richter sought mental health services for the first time at WCI. He did not seek services for the first four years before that because he self-medicated by smoking marijuana which he purchased in the institution. When he lost his prison job after receiving a conduct report for possession of intoxicants, he could no longer afford marijuana and turned to a psychiatrist to obtain a prescription for Wellbutrin. *Id*. at ¶¶ 54–56. Wellbutrin is a psychotropic medication used to treat clinical depression; its effects can imitate those of street drugs such as methamphetamine and cocaine. Its effects are known in the prison community, and inmates often seek a prescription to get high off of it. *Id*. at ¶ 57.

On November 29, 2016, Richter was seen in PSU by Dr. Engstrom, a psychologist, due to threats of self-harm. Dr. Engstrom noted that Richter wanted to go back on Wellbutrin because it is the only antidepressant that worked for him in the past. Dr. Engstrom also noted that Richter denied having any plan or intent to commit self-harm and that it appeared Richter made threats of self-harm in order to be seen more quickly by PSU. *Id*. at ¶ 59.

5

On December 5, 2016, Richter submitted an HSR asking to be seen for his depression because he had been previously hospitalized for suicide attempts. In particular, Richter asked to be put back on Wellbutrin. *Id*. at ¶¶ 60–61. Dr. Engstrom visited him that day and noted that despite Richter's complaints of worsening depression and fear of self-harm, he was calm, cooperative, and denied any imminent suicidal and self-harm intent or plan. *Id*. at ¶ 62. Richter was seen again on December 12, 2016 by Dr. McLaren. Dr. McLaren noted that Richter described his mood as "alright," denied any thoughts of self-harm, and offered Richter self-help material, which he declined. *Id*. at ¶¶ 63–64.

On December 22, 2016, Richter saw Dr. Andrew Kessler, a psychiatrist, and was diagnosed with unspecified depressive disorder, history of malingering, cannabis use disorder, history of methamphetamine use disorder, history of cocaine use disorder, and antisocial personality disorder. Dr. Kessler noted that Richter could no longer afford marijuana; therefore, Richter told him he needed to go back on Wellbutrin because that was the only drug that worked for him. Dr. Kessler noted that Richter had a history of distorting his treatment for depression and that two other doctors had noted in Richter's medical records his propensity for malingering, which is characterized as falsely or grossly exaggerating medical complaints for a reward, in order to obtain medications and disability upon release. Dr. Kessler noted he was inclined to believe the assessments of the previous doctors because Richter's tone and demeanor did not match the allegations of his severe depression. *Id*. at ¶¶ 65–69.

Instead of prescribing Richter Wellbutrin, Dr. Kessler prescribed venlafaxine XR. Later that day, Richter submitted an HSR asking for a list of venlafaxine XR's side-effects. *Id*. at ¶¶ 70–71. On January 5, 2017, just two weeks after being prescribed venlafaxine XR, Richter submitted an

6

HSR alleging he was experiencing headaches and cold-sweats and asking to speak to his psychiatrist. At some point in January, he stopped taking the venlafaxine XR. *Id*. at ¶¶ 72–73.

On March 5, 2017, Richter submitted an HSR alleging he had experienced side effects with venlafaxine XR and needed to see a psychiatrist because his depression was worsening. A nurse informed him he was scheduled to be seen by one. *Id*. at ¶ 74. On March 12, 2017, Richter made several small, superficial cuts to his wrist with a toenail clippers. This was the first time Richter had engaged in self-harm while at Waupun. Richter was placed into clinical observation status because he refused to participate in the risk evaluation process. Nurse York examined his "small superficial cuts," cleaned them, and used glue to close them. *Id*. at ¶¶ 75–77, 84. Dr. Van Buren evaluated Richter in RHU and noted that Richter cut his wrist after reporting being upset with PSU. *Id*. at ¶ 79. On March 14, 2017, Dr. de Blanc met with Richter about the incident and noted that Richter expressed frustrations about the psychotropic medication and an interest in being reevaluated, but that he denied suicidal ideation or plans. *Id*. at ¶ 80.

On March 16, 2017, Richter submitted an Information Request asking to be seen by a psychiatrist because he just attempted suicide and his depression was worsening. The same day, Richter's mental health code was changed to an MH-1 to reflect his psychotropic medication and treatment needs. *Id*. at ¶¶ 81–82. On March 20, 2017, Dr. Van Buren saw Richter again as a follow-up to the self-harm incident. Dr. Van Buren noted that Richter was still upset that psychiatry had not seen him but denied any current suicidal ideation, plan, or intent. *Id*. at ¶ 83.

On April 7, 2017, Dr. Van Buren saw Richter, who complained that he was not being seen by psychiatry and discussed the lawsuit he intended to file. Richter also was adamant that therapy did not work and made his symptoms worse but denied any current suicidal ideation. *Id*. at ¶ 85.

Two days later, on April 9, 2017, Richter filed another Information Request complaining that he needed to see a psychiatrist because his depression was worsening and he had attempted suicide. He also alleged that he was being denied adequate psychological treatment. Staff responded that he was being moved up the list. *Id*. at ¶ 86.

On April 10, 2017, Dr. Rigueur, a psychiatrist, saw Richter, who denied current or repeated suicidal or homicidal ideation. Dr. Rigueur prescribed Richter buproprion, the generic name for Wellbutrin. *Id*. at ¶ 87. Richter was seen again on April 25, 2017, by Dr. Van Buren, who noted his mood was euthymic and congruent with his affect and that Richter denied suicidal ideation, plan, or intent. *Id*. at ¶ 88. On May 8, 2017, Richer told Dr. Rigueur at a follow-up visit that the Wellbutrin dose was "too little" and asked if the medication could be increased in the evening. Dr. Rigueur doubled the Wellbutrin dose and noted that Richter continued to deny current or repeated suicidal or homicidal ideation, intent, or plan. *Id*. at ¶¶ 89–90.

On May 26, 2017, Dr. Van Buren saw Richter again and Richter expressed concern that his diagnoses were not appropriate and asked for psychological testing. On June 7, 2017, Richter was administered several psychological tests. Dr. Van Buren went over the results with Richter on June 9, 2017, and found that one of the tests was deemed "invalid due to responding in an exaggerated manner, including endorsing rare symptoms" and another was to be "interpreted with caution due to possible exaggeration of symptoms." During the meeting, Richter denied any disturbances in sleep, concentration, or appetite and denied any suicidal ideation, plan, or intent. *Id*. at ¶¶ 91–93.

On July 6, 2017, Richter submitted an HSR complaining that Dr. Rigueur told him he would be seen in two to three months and that he needed to discuss his Wellbutrin. Richter submitted the HSR because he wanted his Wellbutrin dosage increased. *Id*. at ¶¶ 94–95.

On July 7, 2017, Dr. Van Buren saw Richter to administer another psychological test. Richter denied any disturbances in sleep, concentration, or appetite. He also denied suicidal ideation, plan, or intent. On July 28, 2017, Dr. Van Buren saw Richter again to discuss the test results and the fact that Richter had been diagnosed with malingering in the past. Dr. Van Buren noted that Richter had no evidence of a thought disorder; no disturbances in sleep, concentration or appetite; and no suicidal ideation, plan, or intent. *Id*. at ¶¶ 96–97.

On August 6, 2017, Richter submitted an HSR stating that he was having suicidal thoughts and asking to discuss his medication because his depression was worsening. Vick responded that he was on the list to see a psychiatrist when coverage was available. *Id*. at ¶ 98. On August 13, 2017, Richter submitted an Information Request again complaining that he had not been seen by psychiatry. He did not mention any suicidal ideation. The nurse responded that Dr. Rigueur had left the DOC and telepsychiatry, a visit with a psychiatrist by video conference, was the only option. The nurse also encouraged Richter to alert staff if there was an issue that needed to be resolved more quickly. *Id*. at ¶ 99.

On August 17, 2017, Richter submitted an HSR complaining that he needed to speak with PSU about his medication and worsening depression. Specifically, he complained that he wanted his dosage increased. Nurse Jensen referred it to a psychiatrist. *Id*. at ¶ 100. On August 20, 2017, Richter submitted a PSR which complained that "because of the spike in suicidal areas you could 'definitely give a depression diagnosis.' Your report in my file does not reflect that statement though. How am I suppose to get the proper treatment if my diagnosis do not get changed if they need to as you said?" *Id*. at ¶ 101. Dr. Van Buren responded that he was diagnosed with depressive disorder but that he had not demonstrated several symptoms related to depression outside of suicidal

9

ideation. *Id*. Richter believed that he was not getting the dosage of Wellbutrin he desired because he did not have the diagnosis of unspecified depressive disorder. *Id*. at ¶ 102.

The same day he received Dr. Van Buren's response, Richter submitted an HSR stating

> I have attempted to see you to discuss my medication. I'm a burden to everyone and there is no reason to live. All I do is take up needed bed space. By the time you get this hopefully I'm dead! Good bye cruel world.

*Id*. at ¶ 103. Richter submitted the HSR, returned to his cell, and made several superficial cuts to his wrist with a razor, which he flushed down the toilet after his cellmate discovered him and alerted the guards. *Id*. at ¶¶ 104, 106–07.

Richter was escorted to RHU, where a nurse treated his wounds with antibiotic ointment and gauze. He denied pain or the need for future assessment. He refused to engage in a risk assessment performed by PSU, so he was placed in clinical observation for his safety. When Dr. Van Buren checked on Richter, he claimed he cut himself because he was tired of the "BS" and frustrated that he had not seen a psychiatrist for several weeks. The next day, August 21, 2017, when a nurse removed his dressing and cleaned the wounds, she noted the lacerations were superficial. *Id*. at ¶¶ 108–11.

On August 22, 2017, Dr. de Blanc followed up with Richter and noted that Richter was hoping to receive a medical reevaluation. Dr. de Blanc also noted that Richter's thought process was logical and that there was no evidence of delusional ideation, suicidal ideation, or plans or intentions to engage in self-harming behaviors. *Id*. at ¶ 113.

On August 28, 2017, Richter submitted another HSR to have his Wellbutrin increased. *Id*. at ¶ 114. That same day, Dr. Van Buren saw him again and noted that he denied suicidal ideation

or urges to cut himself. Richter also complained that he was depressed and upset that the psychiatrist had not seen him since May. *Id.* at ¶ 115.

On September 1, 2017, Richter saw Dr. Alam, who declined to increase his Wellbutrin dose. Dr. Alam also noted that Richter wanted to be changed to the extended release medication so he could receive a higher dose. After seeing Dr. Alam, Richter submitted an HSR complaining that Dr. Alam had refused to increase his medication or to place him on the extended release. He alleged that she lied about the dosages available to him while in prison because he had seen higher dosages while on the street. He finished his HSR with

> I would like to have my Buproprin [Wellbutrin] SR dose increased from 2 75 mg tabs in the morning and 2 75 mg tabs at pm to 2 100 mg tabs in the morning and 2 100 mg tabs at pm. This is an attempt to exhaust my administrative remedies.

*Id.* at ¶ 117. Three days later, Richter filed another Information Complaint alleging that he knew higher dosages of Wellbutrin were available and that he needed his dosage increased to deal with his depression and suicidal thoughts. *Id.* at ¶ 118. On September 5, 2017, Richter submitted another HSR complaining that Dr. Alam would not increase his Wellbutrin because she saw no need, but noting that his suicide attempts occurred before she arrived and that he might try again as further evidence of his alleged need. *Id.* at ¶ 119. For the remainder of September, Richter submitted several other requests seeking an increase in his Wellbutrin and threatening worsening depression and suicide. *Id.* at ¶ 120.

On October 2, 2017, Richter submitted another HSR stating:

> I have been telling you I need my Bupropin [Wellbutrin] increased due to my depression getting worse. You do not respond to any of my requests. It's apparent my only way to stop this suffering is to kill myself and end all of it!

*Id.* at ¶ 121. Dr. Van Buren met with him because of the HSR. Richter denied any current suicidal ideation and complained that he did not want to speak to PSU, but rather he wanted his Wellbutrin

11

increased. Dr. Van Buren warned that threatening to engage in self-harm would not make him see the psychiatrist sooner. *Id*. at ¶ 122. Nevertheless, Richter continued to submit requests containing both tacit and explicit threats of self-harm. *Id*. at ¶ 123. On October 25, 2017, Dr. McLaren saw Richter and noted there was no observable evidence or report of acute symptoms or safety issues. *Id*. at ¶ 124.

On November 15, 2017, Richter was seen by Dr. Linder, another psychiatrist, who noted that Richter's main goal was to receive Wellbutrin XL 450 mg per day. Dr. Linder noted that Richter emphatically stated that it had always helped him before. Dr. Linder declined to increase Richter's medication. *Id*. at ¶ 125.

Recently, Richter saw Dr. Callister who increased Richter's Wellbutrin to the maximum dose of 450 mg daily. Richter has not engaged in any acts of self-harm since. Additionally, Richter has not presented with any signs of a thought disorder or a cognitive deficit. *Id*. at ¶¶ 126–28.

## LEGAL STANDARD

Under the Federal Rules of Civil Procedure, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

Summary judgment is "not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact

to accept its version of the events." *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (citing *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005)). The court is not required to search through the record to make an argument on behalf of a party. *See Corley v. Rosewood Care Ctr.*, 388 F.3d 990, 1001 (7th Cir. 2004) (citing *Albrechtson v. Bd. of Regents of Univ. of Wis. Sys.*, 309 F.3d 433, 436 (7th Cir. 2002) ("Judges are not like pigs, hunting for truffles buried in the record.")). Therefore, "the party bearing the burden of proof on an issue may not simply rest on its pleadings, but must affirmatively demonstrate, by specific factual showings, that there is a genuine issue of material fact requiring trial." *First Nat'l Bank v. Lewco Sec. Corp.*, 860 F.2d 1407, 1411 (7th Cir. 1988). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## ANALYSIS

To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must allege that (1) he was deprived of a right secured by the Constitution or laws of the United States and (2) the deprivation was visited upon him by a person or persons acting under the color of state law. *Buchanan-Moore v. Cty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009) (citing *Kramer v. Vill. of N. Fond du Lac*, 384 F.3d 856, 861 (7th Cir. 2004)); *see also Gomez v. Toledo*, 446 U.S. 635, 640 (1980). In this case, Richter claims Defendants violated his Eighth Amendment right not to be subjected to cruel and unusual punishment. As state employees, it would seem clear they were acting under color of state law.

Richter's claim is predicated on the principle adopted by the Supreme Court in *Estelle v. Gamble* that "deliberate indifference to serious medical needs of prisoners constitutes the

13

'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." 429 U.S. 97, 104 (1976). The principle derives from the fact that "[a]n inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Id.* at 103. The harm addressed in *Estelle*, involving severe back and chest pain, was the additional pain, suffering, and even death that can result from untreated physical illnesses and injuries. The doctrine has also been applied, however, to encompass not just the physical health needs of inmates, but also their mental health needs. *See, e.g.*, *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983) (noting that "[t]reatment of the mental disorders of mentally disturbed inmates is a 'serious medical need'" (citing *Ramos v. Lamm*, 639 F.2d 559, 574 (10th Cir. 1980), *cert. denied*, 450 U.S. 1041 (1981); *Inmates v. Pierce*, 612 F.2d 754, 763 (3d Cir. 1979); *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977); *Finney v. Mabry*, 534 F. Supp. 1026, 1037 (E.D. Ark.1982))).

To state a claim for deliberate indifference to medical care, a prisoner must show that (1) he suffered from an objectively serious condition which created a substantial risk of harm and (2) the defendants were aware of the risk and intentionally disregarded it. *Farmer v. Brennan*, 511 U.S. 825, 842 (1970). A medical need is considered sufficiently serious if the inmate's condition "has been diagnosed by a physician mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (citations omitted). Subjective knowledge of the risk is required: "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838. Evidence of negligence, medical malpractice, or even gross negligence does not equate to deliberate

14

indifference. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). Furthermore, dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient. *Id*.

**A. No Serious Medical Need**

In this case, Richter has failed to offer any evidence from which a reasonable jury could find that he even suffered from a serious mental health condition. The fact that Richter was relatively recently diagnosed with several mental disorders is not evidence of the kind of severe condition that would have obviously required treatment. State prisoners claim to suffer from mental illnesses or disorders for which diagnoses are readily given based upon the behavior in which they engage and/or their self-reported symptoms and history. Self-centered and disruptive behaviors that in the past would have been attributed to poor character and malicious intent now are treated as symptoms of one or more of the many mental disorders that are rapidly filling the most recent edition of the Diagnostic Statistical Manual (DSM), the psychiatric profession's diagnostic bible. A diagnosis of a mental disorder, by itself, is not sufficient to establish that an inmate has a serious mental health condition in need of immediate treatment.

Indeed, the undisputed evidence in this case establishes Richter was simply engaged in drug-seeking behavior and used his claim of mental illness and threats to harm himself as the means of obtaining the kind and amount of the drug he was seeking. He has apparently succeeded in obtaining the maximum dose of Wellbutrin and seems to have abandoned his claim. But he has offered no evidence that the failure to prescribe such a drug in the doses he demanded earlier was a denial of needed mental health care. He has offered no medical evidence of such a need. The only evidence he has offered is his own desire for the medication, and since he is not a psychiatrist, he lacks the expertise to render an opinion that is either admissible or sufficient to prove that essential element

15

of his claim. As a result, his superficial attempts to harm must be viewed as nothing more than a ploy to accomplish his goal.

The evidence shows Richter sought no psychological services for the first four years he served at WCI. During that time, Richter by his own admission was working and able to buy marijuana while in prison. Once he could no longer afford to buy drugs on his own, Richter began demanding to see psychiatric services. His demand, however, was not for treatment in general, but for a specific drug that was believed to produce the same effect as the street drugs he previously used. His repeated demand was that he wanted the maximum dosage of Wellbutrin that was available. When psychiatrists prescribed him other medication, he stopped taking it and alleged side effects a mere two weeks after starting the medication and after he had requested a list of potential side effects. When he was not being seen quickly enough, he started threatening and committing self-harm. Throughout this time, Richter was repeatedly being seen by nurses, psychologists, and other mental health staff, but he continued to complain that he was not receiving mental health care. Despite repeatedly denying suicidal ideation to the psychological services staff, he would threaten self-harm in his HSRs, along with his requests to see the psychiatrist to get the Wellbutrin dose he desired. The psychiatrists at first had warned that Richter would malinger or exaggerate his symptoms for the purpose of seeking medication or other benefits. When his threats did not get him an immediate response or he believed he was not being treated quickly enough, he began self-harming, including his August 20th incident, which occurred because he believed he was not getting the Wellbutrin he wanted since he did not have a diagnosis of depression in his medical record. At the very least, this evidence reveals that whatever mental health problems Richter may have had, they

were not viewed as severe by the defendants who saw and treated him. Richter has offered no evidence or argument that would support a finding to the contrary.

**B. No Deliberate Indifference**

Even if Richter had put forth sufficient evidence to show that he had a significant mental illness that caused him severe distress and drove him to harm himself absent a maximum dose of Wellbutrin, Richter's deliberate indifference claims fail as a matter of law because the undisputed evidence fails to show any deliberate indifference on the part of the defendants to that need. The Constitution's ban on "cruel and unusual punishments" imposes a duty on prison officials to take reasonable measures to guarantee an inmate's safety and to ensure that inmates receive adequate medical care. *Farmer*, 511 U.S. at 832.

Richter's claim that Vick failed to prevent his August 20, 2017 suicide attempt fails as a matter of law. To prove an Eighth Amendment claim for failure to intervene, Richter needed to show that Vick "(1) knew of a significant likelihood that he would imminently attempt suicide and (2) failed to take reasonable steps to prevent his attempt." *Davis-Clair v. Turck*, 714 F. App'x 605, 606 (7th Cir. 2018) (citations omitted). There is no evidence that Vick had any subjective knowledge of a significant likelihood that Richter would imminently attempt suicide when she responded to his August 6 HSR, which stated only vaguely that he was having a lot of suicidal thoughts lately. This is partially true because Richter did not imminently attempt suicide, but attempted suicide two weeks later. In between the August 6 HSR and his suicide attempt, Richter filed two more requests for mental health services, on August 13 and 17, neither of which alleged any suicidal thoughts. Richter did not harm himself until August 20, which was the same day he learned that he did not have a depression disorder diagnosis in his medical records. Alleging vaguely

17

that he was having suicidal thoughts was not sufficient to establish that Vick had knowledge that Richter would then attempt to commit suicide two weeks later. *See id*.

Richter's claims that White, Marchant, and Foster were deliberately indifferent in failing to hire enough psychiatrists also fails as a matter of law. Dr. Kallas and the DOC were responsible for hiring and staffing psychiatrists, not White, Marchant, or Foster. Therefore, Richter's claims fail because neither White, Marchant, nor Foster was personally responsible for the psychiatry staff shortage. *See Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995).

More fundamentally, because he cannot prove deliberate indifference to his own needs, any under-staffing problems are irrelevant to his claim. At most, Richter's complaint is that he did not see a psychiatrist as frequently as he wanted. But that is not the same as saying that Richter was not receiving any mental health care. Richter was regularly seen by mental health professionals at his request or in response to his self-harm behavior. Despite the psychiatry staff shortage, Richter was seen by a mental health professional some sixteen times from November 2016 through October 2017, an average of over once per month. Richter's real complaint is that most of the medical staff professionals he saw either could not or would not prescribe the drug he wanted in the dose he wanted. In other words, the psychiatric staff was not as receptive to his requests as the drug dealers he had dealt with both inside and outside the institution were. That is hardly a denial of medical care or deliberate indifference to a serious medical need. The Eighth Amendment does not give inmates the right to demand the type of treatment they receive. *See Jackson v. Kotter*, 541 F.3d 688, 697–98 (7th Cir. 2008).

Richter's final claim is against Foster in his official capacity for an injunction requiring Foster to hire enough psychiatry staff to meet the need of the prisoners at WCI. This claim, of course, fails

as well.  The Prison Litigation Reform Act requires that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff." 18 U.S.C. § 3626.  As already noted, Richter has offered no evidence to show that the current, or prospective, staffing requirements are insufficient to meet the needs of WCI inmates.  Nor has he offered any evidence that the staffing requirements were insufficient to meet his mental health needs.  Even aside from these failures of proof, Richter's claim for prospective relief appears to be moot now that the psychiatric staff has acquiesced in his demands and provided him with the prescription he was demanding.  According to his own testimony, Richter is satisfied with psychiatric care he is currently receiving.  DPFOF at ¶ 58.  And why wouldn't he be?

## CONCLUSION

In sum, by failing to respond, Richter has failed to provide evidence to support any of the claims he brings.  Defendants, on the other hand, have produced evidence that shows that when he lost the income needed to provide himself with drugs, Richter claimed he had serious psychiatric problems and deliberately self-harmed himself in order to manipulate the prison health system into providing him with the prescription he sought.  Because Richter has failed to present evidence that he was seriously mentally ill or that any of the defendants was deliberately indifferent to such illness, Defendants' motion for summary judgment (ECF No. 20) is **GRANTED** and the case is **DISMISSED**.  The Clerk is directed to enter judgment accordingly.

**SO ORDERED** this   27th   day of December, 2018.

s/ William C. Griesbach  
William C. Griesbach, Chief Judge  
United States District Court